*575 WILKINSON, Chief Judge,
concurring in the denial of rehearing en banc:
I concur in the denial of rehearing en banc. My dissenting colleague endorses the unbounded assertion of federal judicial power over core state functions that the actions of the district court reflect. Such a view is utterly irreconcilable with the principles underlying our system of dual sovereignty. Under the dissent’s approach, the federal chancellor’s control over basic state functions will be unfettered and complete.
I shall not review in detail all of the points in the panel opinion. See Johnson v. Collins Entertainment Co., 199 F.3d 710 (4th Cir.1999). Rather, I will briefly recapitulate the principal factors that in combination rendered the district court’s refusal to abstain an abuse of discretion.
1. The district court had no basis in the South Carolina Unfair Trade Practices Act or in the Racketeer Influenced Corrupt Organizations Act for its order. Indeed, it had no basis in any state or federal statute for a sweeping injunctive decree. The court instead invoked its “inherent equitable power” to undertake a basic state regulatory function. This wholly discretionary enterprise has no logical stopping point. “Inherent” power wielded by life-tenured judges without authorization in statute over the basic functions of a sovereign state simply goes too far. Cf. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 119 S.Ct. 1961, 1969, 1974, 144 L.Ed.2d 319 (1999) (Equity jurisdiction does not vest federal courts with “a general power to grant relief whenever legal remedies are not practical and efficient” because “it would literally place the whole rights and property of the community under the arbitrary will of the Judge.” (internal quotation marks omitted)).
2. This case has been dominated by unsettled questions of state law from the outset. These state law issues bear on policy problems of substantial public importance, see New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (NOPSI), at the heart of the state police power, see Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). In fact, the state courts were addressing the questions of the payout limit interpretation and the application of state unfair competition law to the payout statute at the very time the district court rendered its pronouncements. Contrary to the dissent’s characterization, these state law questions were hardly “straightforward” at the time. Indeed, the state attorney general observed in withdrawing from the case that there were at least three possible interpretations of the payout limit. Other state law issues remain unresolved. See Collins Entertainment, 199 F.3d at 728. The presence of such disputed questions of state law in an area of core state policy concern was one among many factors counseling abstention. See, e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).
3. The district court’s actions supplanted the efforts of the state agencies charged with the enforcement of the regulatory scheme. The court admitted as much when it prefaced its decree with pointed criticism of the enforcement efforts of the South Carolina State Law Enforcement Division and the South Carolina Department of Revenue. Such commandeering of state enforcement efforts is hardly consistent with the “scrupulous regard for the rightful independence of state governments” that the Supreme Court requires. Quackenbush, 517 U.S. at 718, 116 S.Ct. 1712.
4. The district court’s assumption of state regulatory prerogatives was compounded by the minute detail of its injunc-tive decree. The panel opinion describes at some length the detailed requirements that the district court imposed on the businesses targeted by the plaintiffs. See Collins Entertainment, 199 F.3d at 718, 724. *576 These requirements included, among many-other things, posting a “clarifying sign” with court-ordered language on each machine and keeping detailed court-ordered records about customers receiving payouts. Not only is the intricacy of the decree troubling in its own right, but such a step would likely draw the district court into an even more intrusive regulatory enterprise. If federal courts become regulators to this extent of private businesses under state regulatory auspices — and do so without any solid warrant in law — the boundaries of state and federal power will become altogether indistinct.
5. The selective enforcement character of the district court’s actions was also troubling. The district court allowed the plaintiffs to single out a subset of the putative defendant class for the judicially crafted enforcement regime. These decisions concerning the allocation of enforcement resources are, however, precisely the kinds of decisions that ordinarily rest in the hands of state regulatory agencies.
6. The independence of state administration of a comprehensive regulatory scheme is at stake here even though private actors are the named parties in the action. The statute at issue touches virtually every aspect of the video poker industry and every branch of state government is intimately involved in its regulation. See Collins Entertainment, 199 F.3d at 715-17, 723. The state legislature, state courts, state Administrative Law Judge Division, and two major state administrative agencies all fashion rules and policies that govern the most minute details of industry practices. See id. To claim that there is no “comprehensive administrative scheme with which to interfere,” as the dissent does, simply belies reality.
Notwithstanding this web of state regulation, the plaintiffs asked the district court to step in and fashion a different enforcement scheme than the one the state agencies were implementing at the time. This was just as much an invitation to interfere with the administration of the scheme as it would have been had plaintiffs directly challenged the enforcement efforts of SLED and DOR. To restrict Burford to only those cases involving direct challenges to the operation of state regulatory regimes would violate the Supreme Court’s admonitions against a “checklist” approach to abstention. See, e.g., Quackenbush, 517 U.S. at 727, 116 S.Ct. 1712 (Cases “do not provide a formulaic test for determining when dismissal under Burford is appropriate.”); Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 n. 9, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (Abstention “reflect[s] a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes.”). The dissent’s preoccupation with an omitted portion of a quote from NOPSI simply reflects an attachment to this impermissible checklist mentality. Indeed, the Supreme Court itself in Quackenbush omitted the reference to interference with state administrative proceedings or orders in quoting the same passage from NOPSI on which the panel relied. Compare Quackenbush, 517 U.S. at 726-27, 116 S.Ct. 1712, with Collins Entertainment, 199 F.3d at 719.
7. The state attorney general had withdrawn from this case on the ground that the state legislature had delegated the task of regulatory oversight to the administrative arm of state government. He also stated that it was his practice to defer to the Department of Revenue on the construction of state regulatory statutes and noted that the interpretation of the payout limit statute was unsettled. The position of the state’s chief law enforcement officer on the roles of the respective actors in the state regulatory scheme should have cautioned the district court and underscored the advisability of abstention here.
8. In light of the myriad factors mentioned above and discussed at length in the panel opinion, it is clear that the dissent’s abstract rendition of the panel’s holding is mere hyperbole. Abstention analysis rests, as it always does, on an examination *577 of the totality of the particular circumstances present in the given case.
Burford abstention is rooted in the law of remedies, being “derive[d] from the discretion historically enjoyed by courts of equity.” Quackenbush, 517 U.S. at 728, 116 S.Ct. 1712. The premise underlying abstention is that federal courts should not exercise expansive remedial powers when to do so would damage principles of federalism and comity to the extent that happened here. To condone the district court’s actions in this case would be to endorse broad federal equitable sway over the most basic state regulatory functions. Preserving our federal system of government in any meaningful sense means not acquiescing in the vision of limitless federal judicial power manifested here.